WO

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

Barbara Joy McElmurry,

Plaintiff,

v.

Arizona Department of Agriculture,

Defendant.

No. CV-12-02234-PHX-GMS

**ORDER**

Pending before the Court are Defendant's Motions for Summary Judgment (Doc. 57) and to Strike Plaintiff's Reply in Support of Opposition to Summary Judgment (Doc. 65). For the following reasons, the Motions are granted.

**BACKGROUND**

This case arises from Plaintiff Barbara Joy McElmurry's employment with Defendant Arizona Department of Agriculture (the "Department"). The Department hired McElmurry on February 1, 2010 as an Agriculture Inspector II in the Department's Plant Services Division in Yuma, Arizona. (Doc. 60 ("PSOF") ¶ 2; Doc. 58 ("DSOF") ¶ 1.) Her role was part of the Department's efforts to combat the Asian citrus psyllid (ACP), a small insect. (DSOF ¶¶ 2–4.) Agriculture Inspectors at the Department have two major responsibilities. (DSOF ¶ 3.) First, they do field work in which they monitor and inspect plants, plant materials, and commodities for specific pests. (*Id.*) Second, they do screening, in which they screen traps for pests by viewing the traps under a microscope. (*Id.*)

When Plaintiff was hired in 2010, some of her fellow new Inspectors were assigned to screening duties, some of them were assigned field work duties, and some were allowed to rotate between the two roles. (DSOF ¶ 2.) Plaintiff was assigned to screening duties. (PSOF ¶ 3.) In fall 2010, following complaints about physical discomfort from some employees assigned to screening duties, Yuma Operations Manager Jerry Reiffenberger and the Department implemented a formal rotation of duties for qualified ACP Agriculture Inspectors. (DSOF ¶ 9.) This rotation program did not actually begin until June 2011. (PSOF ¶ 9.)

In July 2010, Department employee Mary Garman was appointed Agriculture District Supervisor of the ACP program. (PSOF ¶ 8; DSOF ¶ 11.) At some point later, Reiffenberger began hearing reports from ACP Agriculture Inspectors that there was ongoing conflict between Garman and McElmurry. (PSOF ¶ 8; DSOF ¶ 11.) On August 25, 2010, McElmurry met with Reiffenberger and Garman and discussed "harassment that Ms. Garman was perpetrating on [Plaintiff] and other employees." (PSOF ¶ 4.) After the meeting, this harassment escalated. (*Id.*) Garman constantly watched McElmurry, threatened to fire her, made comments about her short stature, and touched her. (*Id.*) Garman also moved some screening employees to the field, leaving McElmurry to have to screen a higher number of traps. (*Id.*) No field employees were brought into the lab to make up for this shift. (*Id.*)

On September 29, 2010, Garman again threatened McElmurry and McElmurry told Reiffenberger that she was going to file harassment charges against Garman. (PSOF ¶ 11.) Reiffenberger suggested there would be consequences for McElmurry if she did so. (*Id.*) On September 30, 2009, McElmurry called into work sick and left a voicemail message on Garman's answering machine. (*Id.*) McElmurry states that Garman called Reiffenberger to report that McElmurry said sarcastic things in this message, but that this was not the case. (*Id.*)

At this point, Reiffenberger spoke to Department Human Resources Manager Anna Villa and discussed McElmurry's alleged inappropriate conduct, including her

inability work with Garman and poor attitude in the workplace. (DSOF ¶ 14.) He decided to terminate McElmurry, and Villa began to prepare the paperwork to do so. (*Id.*)

In early October 2010, McElmurry gave a written complaint of harassment to Reiffenberger. (PSOF ¶ 12; DSOF ¶ 15.) The written complaint describes that Garman had been rude to McElmurry and to other employees, that both McElmurry and other employees had suffered from eyestrain from their screening duties, and that Garman was angry with her "because [she] asked [Garman] not to touch me, grab my arm, put her head on top of my head and put her arms around my shoulders and not to call me 'hon'" because these behaviors made McElmurry "very uncomfortable." (Doc. 58-1, Ex. 5.) McElmurry states that Villa spoke to her and others about the charge and "focused on this charge as if it was about 'sexual harassment' and not the true harassment that was happening.'" (PSOF ¶ 14.) Defendant conducted an investigation into McElmurry's charge and found that no other Department employees had witnessed Garman touching, hugging, or grabbing McElmurry or calling her "hon." (DSOF ¶ 21.) McElmurry told Reiffenberger that Garman had touched her arm to get her attention and Villa instructed Garman to not touch employees in order to get their attention. (DSOF ¶ 22.) In late October, Villa met with McElmurry about the results of investigation, informed her she had been unable to sustain McElmurry's harassment allegations, and told her she needed to follow her supervisor's direction even when she did not agree with it. (DSOF ¶ 23.)

While implementing the formal rotation of Inspectors, the Department discovered that many Inspectors had not undergone the physical examinations required to do field work. (DSOF ¶¶ 24–28.) The Department required these employees to have the examinations completed. (*Id.*) McElmurry had her physical on October 27, 2010 and was cleared for duty without any restrictions. (PSOF ¶¶ 15–16; DSOF ¶ 32.)

On October 31, 2010, McElmurry was scheduled to begin field work training, but this was put on hold because McElmurry made a verbal request for a workplace accommodation. (DSOF ¶ 33.) On November 3, 2010, McElmurry submitted a letter from a physician's assistant stating that she "is of short stature at 58 inches tall" and

1  requires accommodations to drive large trucks and field cars." (DSOF ¶ 34; Doc. 58-1,
2  Ex. 7.) In response to this request, Lisa Laird, a Loss Prevention Consultant for the State
3  of Arizona's Risk Management Division, conducted a workplace assessment in the
4  presence of Anna Villa. (DSOF ¶ 36.) During this assessment, McElmurry "was
5  subjected to having two [Department] employees crawl over her seated in a vehicle while
6  the measured her from buttocks to feet" and "[n]o explanation was given to her for this
7  action." (PSOF ¶ 19.) McElmurry challenged Laird's qualifications during the
8  assessment and asked Villa if she was being retaliated against for being required to
9  perform field work duties. (DSOF ¶ 37.) McElmurry states that it is alleged that she
10 received a Memorandum of Concern for her behavior during the assessment, but that this
11 is not true because the Department cannot provide a copy of the Memorandum that is
12 signed by McElmurry. (PSOF ¶ 22.)

13 After the assessment, Laird recommended to Villa that McElmurry be allowed to
14 drive a smaller car and that a seat cushion would allow her to do so safely. (DSOF ¶ 39.)
15 Laird also suggested that the Department put in writing that McElmurry's field work
16 route not involve orchards, but instead involve traps placed at lower heights. (DSOF ¶
17 40.) While a cushion was ordered, McElmurry never received it. (PSOF ¶ 23.)
18 McElmurry was then transferred to the field and Garman told her she would never return
19 to screening. (PSOF ¶ 24.) McElmurry injured her ankle while in the field and Garman
20 denied her a Worker's Compensation Claim. (*Id.*) McElmurry took time off work and,
21 upon her return, Reiffenberger told her to return to the lab for screening duties. (*Id.*) That
22 same day, ACP program Administrative Secretary Coleen Nelson called Reiffenberger to
23 complain that McElmurry had used loud, inappropriate language at work. (DSOF ¶ 45.)
24 McElmurry was terminated later that day. (PSOF ¶ 25; DSOF ¶ 46.) McElmurry talked to
25 Anna Villa and was told that the Department did not need to have a reason to fire her
26 because Arizona is a right-to-work state. (PSOF ¶ 25.) McElmurry contacted the
27 Department Division of Occupational Safety and Health and they did an investigation
28 into her discrimination claims. (PSOF ¶ 26.)

On July 13, 2011, McElmurry filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). (DSOF ¶ 49.) On August 8, 2012, the EEOC issued a Dismissal and Notice of Rights to McElmurry. (DSOF ¶ 50.) On October 5, 2011, the Arizona Civil Rights Division ("ACRD") issued McElmurry a Notice of Right to Sue, noting that she had filed a charge on January 14, 2011 and that she had approximately 90 days remaining "before the expiration of the one year deadline for filing a civil action in Superior Court." (DSOF ¶ 51.)

McElmurry filed the present action in this Court on October 18, 2012, alleging various forms of discrimination. (Doc. 1.) On June 11, 2013, the Court granted Defendant's Motion to Dismiss McElmurry's age discrimination claims, disability discrimination claims under the Arizona Civil Rights Act ("ACRA"), and her wrongful termination claim. (Doc. 15.) The Court denied Defendant's Motion with respect to Plaintiff's disability claims under the Americans with Disabilities Act ("ADA") and her other discrimination claims. (*Id.*) Defendant now moves for summary judgment on Plaintiff's remaining claims. (Doc. 57.)

**DISCUSSION**

**I. Motion to Strike**

Defendant moves to strike Plaintiff's second reply to Defendant's Motion for Summary Judgment. (Doc. 65.) On December 30, 2013, Plaintiff filed a Response to Defendant's Motion for Summary Judgment. (Doc. 59.) On January 29, 2014, Plaintiff filed a second Response to that Motion. (Doc. 64.) This second response, titled "Plaintiff's Reply in Support of Opposition of Motion for Summary Judgment," is not authorized by any statute, rule, or court order. Thus, pursuant to LRCiv 7.2(m)(1), the Court grants Defendant's Motion to Strike this pleading and will not consider it in reviewing Defendant's Motion for Summary Judgment.

**II. Summary Judgment**

    **A. Legal Standard**

Summary judgment is appropriate if the evidence, viewed in the light most

favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Substantive law determines which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248). Thus, the nonmoving party must show that the genuine factual issues "'can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics*, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson*, 477 U.S. at 250). Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, . . . [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). Furthermore, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995).

**B.    State Claims**

Defendant moves for summary judgment on Plaintiff's remaining claims under the ACRA because any such claims are time-barred. On October 5, 2011, McElmurry

received a Right to Sue letter from the ACRD which noted that she had filed her charge on January 14, 2011 and instructed that if she wished to file a civil action she "must do so within 90 days of the date you receive this Notice or within one year of the date you filed the charge, whichever comes first." (DSOF ¶ 51.) McElmurry did not file her Complaint until October 18, 2012, months after this statute of limitations had run. (Doc. 1.) McElmurry does not appear to deny that her ACRA claims are time barred or assert any basis on which the statute of limitations might be tolled. Any of McElmurry's remaining ACRA claims are barred by the statute of limitations.

### C. Americans with Disabilities Act (ADA) Claim

Next, Defendant moves for summary judgment on Plaintiff's ADA claim because the claim is barred by the Eleventh Amendment. Under the Eleventh Amendment to the Constitution, "agencies of the state are immune from private damage actions or suits for injunctive relief brought in federal court." *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1195 (9th Cir. 2005) (internal quotations omitted). That immunity remains present until it is expressly waived by either the state itself or Congress, acting pursuant to its powers under §5 of the Fourteenth Amendment. *See id.*; *Fitzpatrick v. Bitzer*, 427 U.S. 445, 452–55 (1976) ("Congress may, in determining what is 'appropriate legislation' for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts.")

Here, Plaintiff has not identified any express waiver of sovereign immunity by the State of Arizona. McElmurry claims that Arizona waived its immunity by accepting federal money to run the ACP program. (Doc. 59 at 7.) "To be a valid waiver, a state's consent to suit must be 'unequivocally express in the statutory text'" and "there can be no consent by implication or by use of ambiguous language." *Holley v. Calif. Dept. of Corrections*, 599 F.3d 1108, 1111–12 (9th Cir. 2010.) McElmurry is unable to demonstrate any such text containing a waiver. McElmurry's ADA claim is barred by the Eleventh Amendment as McElmurry can demonstrate neither a valid, express waiver of

sovereign immunity by the state nor a valid abrogation of this immunity by Congress.

### D. Hostile Work Environment Claim

Defendant moves for summary judgment on McElmurry's Title VII hostile work environment claim because she fails to show the elements necessary to establish such a claim. To prevail on a hostile work environment claim, McElmurry would need to show that her work environment was both subjectively and objectively hostile; that is, she would need to demonstrate that she perceived her work environment to be hostile, and that a reasonable person in her position would perceive it to be so. *Dominguez–Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1034 (9th Cir. 2005) (internal citations omitted). She would also need to show evidence sufficient to establish that any harassment that took place was because of sex. *Id.* (internal citations and quotations omitted).

In analyzing whether the alleged harassment created an objectively hostile work environment, this Court must assess all the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71 (2001)) (internal citation omitted). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citation omitted).

McElmurry does not produce evidence that the alleged conduct constituted sufficiently severe or pervasive discrimination to establish a hostile work environment claim under Title VII. McElmurry alleges that on August 30, 2010, Garman placed her head on McElmurry's head, wrapped her arms around McElmurry's shoulders, and "hung on." (DSOF ¶ 53.) She asked Garman "[i]s this a Kumbaya moment?" and asked to be let go. (DSOF ¶ 54.) Between August and September 2010, Garman touched McElmurry's arm four times and called her "hon." (DSOF ¶ 56.) Garman called McElmurry "hon" "between 12 to 15 times." (DSOF ¶ 63.) McElmurry verbally reported the August 30

incident to Reifffenberger and included it in her October 1, 2010 written complaint. (DSOF ¶ 61.) After October 1, 2010, Garman did not hug or touch McElmurry again. (DSOF ¶ 63.) McElmurry does not actually assert that any of this conduct occurred because of her gender. In her Statement of Facts, she express frustration that when Villa investigated her October 1 written complaint, she "focused on this charge as if it was about 'sexual harassment' and not the true harassment that was happening." (PSOF ¶ 13.)

Even assuming McElmurry alleged that Garman's conduct was motivated by McElmurry's gender, McElmurry has not alleged conduct that was severe or pervasive. Instead, she seems to allege that Garman inappropriately touched her head and arm on five occasions and ceased touching her after she filed her written complaint. This is not conduct that a reasonable person in McElmurry's position would have perceived to be a hostile work environment based on sex. Plaintiff thus fails to establish a prima facie case of sexual harassment under Title VII.

### E. Retaliation Claim

Finally, Plaintiff alleges various retaliation claims. To state a prima facie case of retaliation, McElmurry must allege facts that demonstrate that she was retaliated against for opposing an employment practice made unlawful by Title VII, or because she "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" related to Title VII enforcement. 42 U.S.C. § 2000e–3(a); *see also Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1082 (9th Cir. 1996). The opposition clause protects "only those employees who oppose what they reasonably perceive as discrimination under the Act." *Learned v. City of Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988). While an employee may fail to prove the alleged unlawful employment practice but still prevail on a retaliation claim, "the opposed conduct must fairly fall within the protection of Title VII to sustain a claim of unlawful retaliation." *Id.* (citing *Silver v. KCA, Inc.*, 586 F.2d 138, 132 (9th Cir. 1978)). Similarly, under the "participation" clause, which prohibits retaliation against an individual who made a charge or other participated in an investigation related to Title VII enforcement, "[t]he mere fact that an employee is

1 participating in an investigation or proceeding involving charges of some sort of
2 discrimination, however, does not automatically trigger the protection afforded under
3 section 704(a)." *Learned*, 860 F.2d at 932. Instead, "the underlying discrimination must
4 be reasonably perceived as discrimination prohibited by Title VII." *Id.*

5 Here, while McElmurry did engage in protected activity by making her verbal
6 complaint and filing her written complaint with Reiffenberger, her complaints were not
7 based on a belief that she had been subject to discrimination prohibited by Title VII.
8 Indeed, as noted above, McElmurry was frustrated that her complaint was treated "as if it
9 was about 'sexual harassment' and not the true harassment that was happening." (PSOF ¶
10 13.) This "true harassment" evidently refers to McElmurry's allegations that Garman was
11 impolite and unfair to McElmurry and fellow employees. (Doc. 58-1, Ex. 5.) However,
12 she does not allege that any of that harassment was based on her or any of her co-
13 worker's status as a member of any class protected by Title VII. Plaintiff fails to state a
14 prima facie case of retaliation under Title VII. Therefore,

15 **IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. 57) is
16 **granted**.

17 **IT IS FURTHER ORDERED** that Defendant's Motion to Strike Plaintiff's
18 Reply in Support of Summary Judgment (Doc. 65) is **granted**.

19 **IT IS FURTHER ORDERED** directing the Clerk of Court to terminate this
20 action and enter judgment accordingly.

21 Dated this 2nd day of May, 2014.

*/s/ A. Murray Snow*
_____
G. Murray Snow
United States District Judge